**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MD MOZUMDER,
                          Plaintiff(s),

                      -against-

THE CITY OF NEW YORK, THE NEW YORK
CITY POLICE DEPARTMENT, NEW YORK
CITY POLICE COMMISIONER JAMES P.
O'NEILL, NEW YORK CITY POLICE OFFICER
"JOHN DOE1", NEW YORK CITY POLICE
OFFICER "JOHN DOE2" (fictitious names of
police officers who arrested Plaintiff), NEW
YORK CITY POLICE OFFICERS AND
SUPERVISORY OFFICER(S) "RICHARD
ROE(S)" 1-20 (fictitious names of police officers
and Police Officers who were responsible for the
supervision and training of Police Officer John
Doe), each in their individual and official
capacities,
                          Defendant(s).

Civil Action No.: 17-3606


**COMPLAINT**


Jury Trial Demanded


## NATURE OF THE ACTION

1.      This is a civil action seeking damages against Defendants for committing acts,

under color of law, which deprived Plaintiff of rights secured under the Constitution and laws of

the United States of America and the State of New York; for conspiring for the purpose of

impeding and hindering the due course of justice, with intent to deny Plaintiff of equal protection

on the laws; and for refusing or neglecting to prevent such deprivation and denials to Plaintiff.

2.      Plaintiff MD MOZUMDER's rights were violated when officers of the NEW

YORK CITY POLICE DEPARTMENT ("NYPD") unjustly arrested Plaintiff as he was a

pedestrian on a Brooklyn sidewalk.

3.      Plaintiff's rights were further violated when he was unlawfully detained, arrested

and held in jail.

**JURISDICTION AND VENUE**

4.      This action is brought pursuant to 42 U.S.C. §§ 1983, 1985, 1986 and 1988 and the Fourth and Fourteenth Amendments to the Constitution of the United States.

5.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (4).

6.      An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

7.      Venue is properly laid in the Southern District of New York pursuant to 28 U.S.C. § 1391(a)(1) in that, inter alia, one of the Defendants resides within the Southern District of New York and all Defendants reside within the State of New York.

**SUPPLEMENTAL JURISDICTION**

8.      This Court has supplemental jurisdiction over Plaintiff's claims herein under the Constitution and Laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

9.      Pursuant to New York State General Municipal Law § 50-e, Plaintiff timely filed a Notice of Claim with the New York City Comptroller and the NYPD within ninety (90) days of the events herein complained of, and the Comptroller designated the claim as number 2016-PI-025025.

10.      On or about May 12, 2017, a 50(h) hearing was held at the Law Offices of Dan Schneider, 160 Broadway, 14th Floor, New York, NY 10038.

11.      This action is commenced within one (1) year and ninety (90) days after the happening of the events upon which these claims arise.

**JURY DEMAND**

12.     Plaintiff demands trial by jury on each and every one of the claims pled herein.

**PARTIES**

13.     Plaintiff MD MOZUMDER is a resident of Kings County, New York.  At all time

herein, Plaintiff was a resident of Brooklyn, New York.

14.     At all time herein, Defendant CITY is a municipal corporation duly organized and

existing by virtue of the laws of the State of New York.

15.     At all time herein, Defendant NYPD is the department of the CITY responsible

for, among other things, arresting persons for offenses and maintaining custody over such

persons prior to their initial appearance in court.  At all time relevant hereto, the NYPD, together

with CITY, was responsible for the policy, practice, supervision, implementation, and conduct of

all NYPD personnel.  In addition, at all relevant times, the NYPD, together with CITY, was

responsible for enforcing the rules of the NYPD, and for ensuring that NYPD personnel obeyed

the constitutions and laws of the United States and of the State of New York.

16.     In addition to the facts alleged in the following paragraphs, the following

defendants are all sued in their individual and official capacities and all acted within the scope of

their employment and under color of state law, to wit, under color of statutes, ordinances,

regulations, policies, customs and usages of the State of New York and CITY.

17.     At all relevant times herein, Defendant JAMES P. O'NEILL ("BRATTON") was

the commissioner of the NYPD.

18.     The true names of Defendants POLICE OFFICER JOHN DOE ("DOE") and

SUPERVISORY OFFICER(S) RICHARD ROE(S) ("ROE(S)") are not currently known to

Plaintiff.  However, all of said Defendants are employees or agents of the NYPD.  Accordingly,

said Defendants are entitled to representation in this action by the New York City Law Department ("Law Department") upon their request, pursuant to New York General Obligations Law § 50-k. The Law Department is hereby put on notice (a) that Plaintiff intends to name said officers as defendants in an amended pleading once the true names of said defendants become known to Plaintiff and (b) the Law Department should immediately begin preparing their defense in this action.

## STATEMENT OF FACTS

19.     On June 14, 2016, at approximately 5:10 pm, Plaintiff was in front of 330 Butler Street, Brooklyn, New York for the purpose of returning the yellow cab he rents for work.

20.     Plaintiff had proceeded to drop off the yellow cab and was in the process of starting to lead the individuals in the area in a Muslim prayer.

21.     Simultaneously the Defendants DOE1 and DOE2 approached Plaintiff and demanded his identification.

22.     As Plaintiff provided his identification, he was abruptly and roughly handcuffed and shoved into the Defendants NYPD vehicle as DOE1 called Plaintiff a "bad Muslim" and a "terrorist".

23.     Without probable cause, provocation, or legal basis, Defendants DOE1 and DOE2 placed Plaintiff under arrest.

24.     The seizure and search of Plaintiff was illegal as Plaintiff had not committed a crime or violation and because the individual Defendants did not have reasonable suspicion to believe that Plaintiff had engaged in criminal activity.

25.    Plaintiff was held in a police jail cell located inside the 78th Police Precinct by the individual Defendants for approximately Twenty-three hours from June 14, 2016 at approximately 5:45 PM until June 15, 2016 at approximately 4:30 PM.

26.    While in the custody of the Defendants, Plaintiff was subjected to verbal abuse regarding his race and religion.

27.    At no time during Plaintiff's detention he informed of what criminal violations he was being charged with.

28.    The Defendants intentionally confined Plaintiff without his consent, and the confinement was not otherwise privileged by law and, at all times, Plaintiff was conscious of his confinement.

29.    While Plaintiff was in police custody, individual Defendants prepared or allowed to be prepared false police reports accusing Plaintiff of violating Penal Law § 120.00, Penal Law § 265.01 , Penal Law § 120.14 , Penal Law § 110-120.00, Penal Law § 240.26, and Penal Law § 120.15.

30.    The individual Defendants, despite having a reasonable opportunity to do so, took no action to prevent, end, or truthfully report the unlawful conduct to which Plaintiff was subjected.

31.    On or about July 22, 2016, the charges were dismissed in full and sealed pursuant to CPL § 160.50

**PLAINTIFF'S INJURIES AS A RESULT OF THE INCIDENT**

32.    Plaintiff suffered damage as a result of Defendants' actions. Plaintiff was incarcerated for approximately 23 hours and suffered great shock, pain, suffering, a loss of

freedom, emotional distress, mental anguish, shame, humiliation, indignity, damage to reputation, and deprivation of his constitutional rights.

## CLAIMS FOR RELIEF
### COUNT I (42 U.S.C. § 1983 – Police Brutality)

33. Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

34. The Defendants CITY and the NYPD, including but not limited to DOE1, DOE2 and ROE(S) under the color of law and within the course and scope of their authority, assaulted and battered the Plaintiff in violation of the civil rights of the Plaintiff, more particularly, 42 U.S.C. § 1983 as well as other applicable federal and state laws, including the Fourth and Fourteenth Amendments to the United States Constitution.

35. The deprivation by the Defendants of the Plaintiff's civil rights was the result of DOE1 and DOE2's actions under the color of law and within his authority as a law enforcement officer within his employ of the Defendant CITY and the NYPD.

36. The actions of Defendants DOE1 and DOE2 worked to deprive Plaintiff of his constitutional rights, including the right to be free from the intentional use of unreasonable force, to be free from unreasonable search and seizure and unreasonable and excessive force.

37. The Defendants CITY and the NYPD, including but not limited to DOE1 and DOE2, and ROE(S) were not acting with immunity when they deprived the Plaintiff of his civil rights.

38. At no time during the events described above or as the events occurred did DOE1 and DOE2 have probable cause to detain and arrest Plaintiff MD MOZUMDER.

39. The aforementioned detention and arrest were done knowingly, intentionally and willfully.

40. The aforementioned detention and arrest were done negligently and recklessly.

41. The aforementioned detention and arrest were done without reason, provocation or legal basis.

42. By reason of said incident, Plaintiff was caused to suffer great shock, pain, suffering, a loss of freedom, emotional distress, mental anguish, shame, humiliation, indignity, damage to reputation, and deprivation of his constitutional rights

## COUNT II (42 U.S.C. § 1983 – False Imprisonment)

43. Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

44. There was no warrant for the arrest of Plaintiff on June 14, 2016.  The arrest of Plaintiff was without reasonable grounds for anyone to believe Plaintiff had committed an offense and each of the Defendants who participated in the arrest and detention process knew they were without probable cause to arrest Plaintiff.

45. At no time during the events described above or as the events occurred did the Defendants have probable cause for the arrest of the Plaintiff, and there was no legal basis or excuse for his seizure.

46. Plaintiff was arrested and remained incarcerated for approximately 23 hours when he was released upon his own recognizance due to prosecutions failure to produce any witnesses who would corroborate any justification for the actions taken by the Defendants.

47. As a result of their concerted, unlawful and malicious arrest of Plaintiff, each of the Defendants, acting under color of law and within the scope of their authority, deprived the Plaintiff of his liberty without due process of law and deprived him of equal protection of the laws in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.

48. As a result of their concerted, unlawful and malicious detention and confinement of the Plaintiff, each of the Defendants, intentionally, or with deliberate indifference and callous disregard of Plaintiff's rights, deprived the Plaintiff of his liberty without due process of law and deprived him of equal protection of the laws in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.

<u>**COUNT III (42 U.S.C. § 1983 – Monell Claim)**</u>

49. Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

50. All of the acts and omissions by the Defendants, CITY and the NYPD, including but not limited to DOE1, DOE2 and ROE(S) described above were carried out pursuant to overlapping policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent and cooperation and under the supervisory authority if the Defendant CITY, its agency the NYPD and Defendant BRATTON.

51. Defendant CITY and the NYPD, by Defendant BRATTON and their other policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police Defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

52. The acts complained of were carried out by the aforementioned individual Defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under supervision of ranking officers of the NYPD including Defendant BRATTON.

53. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

a.    Fabricating and/or suppressing evidence in order to justify (or attempt to justify) otherwise suspicionless arrest;

b.    Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

c.    Discouraging police officers from reporting the corrupt or unlawful acts of other police officers;

d.    Retaliating against and/or intimidating officers who report police misconduct; and

e.    Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

54. The existence of the aforesaid unconstitutional  customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against city:

f.    *Schoolcraft v. City of New York*, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to psychiatric facility in retaliation for exposing said policies and practices to the press);

g.    *Taylor-Mickens v. City of New York*, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at 24th precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

h.    *Colon v. City of New York*, 09-CV-0008 (E.D.N.Y.) In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on *Iqbal/Twombly* grounds,

wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

i.   *Callaghan v. City of new York*, 07-CV-9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and retaliatory arrests of bicyclists engaged in expressive conduct, to wit, riding in a Critical Mass bicycle rides after the 2004 Republican National Convention);[1]

j.   *Williams v. City of New York*, 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y.) (officers arrest plaintiff during "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on the premises);

k.   *Dunlop v. City of New York*, 06-CV-0433 (RJS), 2008 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (bystander arrested outside the 2004 republican national Convention while observing arrests occurring in public; alleges that police destroyed exculpatory evidence by deleting portions of video which contradict sworn criminal complaint);

---

[1] For a description of this case and the nearly $1 million settlement, see, Cate Doty, *Bike Riders in New York Win Settlement*, N.Y. Times, October 18, 2010.

l. *Carmody v. City of New York*, 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another officer's claims of hostile work environment);

m. *MacNamara v. City of New York*, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

n. *McMillan v. City of New York*, 04-CV03990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite absence of any quantum of suspicion);

o. *Avent v. City of New York*, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

p. *Smith v. City of New York*, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

q. *Powers v. City of New York*, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officers alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

r. *Nonnemann v. City of New York*, 02-CV010131 (JSR) AJP), 2004 U.S. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth);

s. *Richardson v. City of New York*, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used

excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

t. *Barry v. New York City Police Department*, 01-CV-10627 *2 (CMB), 2004 (U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD dergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

u. *Walton v. Safir*, 99 –CV-4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD shooting death of Amadou Diallo);

v. *White- Ruiz v. City of New York*, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

w. *Ariza v. City of New York*, 93_CV_5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at *14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police

officers who expose police misconduct and a failure to train in the police department); and

x. *Sorlucco v. New York City Police Department*, 89-CV-7225 (CCH), 88 F.2d 4 (2d Cir. 1989) (former officer entitled to trial on issue of whether she was re-assigned and then terminated after reporting a fellow officer had raped her).

y. *Angel Alvarez v. City of New York*, 11-CV-5464 (S.D.N.Y.) (police officers involved in the negligent shooting and false imprisonment of Angel Alvarez, suppressed evidence which proved the innocence of Mr. Alvarez causing him to be confined to prison for a period in excess of 200 days.  While incarcerated, said police officers falsely testified and obtained search warrants for Mr. Alvarez's family home, conducted said search of the home, seized cash from the home and refused to release said cash despite letters from prosecutors advising the police officers to do so.  Police officials, despite being in possession of evidence proving Mr. Alvarez's innocence, perpetuated the false testimony of the police officers by releasing fraudulent statements to the media with respect to the events of the evening of the shooting.)

55. The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct, are further evidenced, inter alia, by the following:

z. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its system for fighting corruption virtually to

collapse. It has become more concerned about the bad publicity that corruption disclosures generate than the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[2]

aa. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

bb. In response to the Honorable Judge Weinstein's ruling of November 25, 2009, in Colon v. City of New York, Infra., in which he noted a "widespread […] custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, Commissioner BRATTON acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[3]

cc. Defendant CITY's tacit condoning of and failure to supervise, discipline or provide remedial training when officers engage in excessive force is evidenced by its systematic disregard of the recommendations of the Civilian Complaint Review Board. CCRB is a CITY agency, allegedly independent of the NYPD,

---

[2] Mollen Commission Report, pp. 2-3.
[3] Oren Yaniv and John Marzulli, *BRATTON Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009.

that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[4]   When it does, however, Police Commissioner BRATTON controls whether the NYPD pursues the matter and he alone has authority to impose discipline and the subject officer(s).   Since 2005, during BRATTON's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe that verbal "instructions."   Moreover, the number of CCRB substantiated cases that the NYPD has simpy dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 to 2006, to 35% in 2007, and approximately 30% in 2008.   Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[5]   As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007.   Substantiated complaints of excessive force against civilians account for more that 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[6]

---

[4]  In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%).  In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%).  See, CCRB Jan.-Dec. 2007 Status Report at p. 19, available at http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf.  Upon information and belief, the low rate of substantiated complaints is due in part to the above noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

[5]  Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

[6]  Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

dd. Keiran Creighton, commander of the NYPD Housing Police Service Area 8 in the

northern Bronx, was investigated for ordering officers to make a certain number

of arrests each month and for pushing officers to falsify documents.  According to

The York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.

> "You can't make nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.

> Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.

> Creighton then told the cops to "finagle" the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.

> Unbeknownst to Creighton, one officer had his NYPD radio switched on – so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Scuylerville and taped by a 911 dispatcher.[7]

ee. In the trial of Carolyn Bryant v. New York City, the panel of jurors ruled that the

police had a policy [quota] "regarding the number of arrests officers were to

make" and that said policy "violated plaintiff's constitutional rights and

contributed to her arrest."  Jurors had said that thet were swayed by the testimony

of Captain Alex Perez of the 81st Precinct, who testified that arrest numbers are a

factor in assessing police officers.[8]

---

[7] Allison Gendar, *NYPD Captain Allegedly Caught In Arrest Quota Fixing*, The New York Daily News, November 14, 2007.
[8] Oren Yaniv, *Court Rules That Cops Do Use Quotas: Woman Injured in 2006 Arrest Settles for $75,000,* The New York Daily News, February 19, 2011.

ff. In the 2011 NYPD ticket fixing scandal, a minimum of 17 police officers – many union delegates - were indicted (more indictments still pending) on charges ranging from perjury, bribery, grand larceny and obstruction.  These indictments stem from wiretap recordings of hundreds of NYPD police officers discussing the procedures on how to fix tickets.  In addition to these conversations, it is reported that the recordings are rife with overtly racist and inflammatory remarks.[9]

56. The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence, are further evidenced, inter alia, by the following:

gg. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system.  It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors.  Corrupt and hones officer told us that their supervisors knew or should have known about falsified versions of searchers and arrests and never question them.[10]
>
> [...]
>
> What breeds this tolerance is a deep-rooted perception among man officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies,

---

[9] Kevin Deutsch, *Ticket Fixing Scandal: NYPD Cops' Racist Talk Caught On Wiretap Recordings*, The New York Daily News, September 26, 2011.
[10] Mollen Commission Report, p. 36.

even if unlawful.  As one dedicate officer put in, police officer often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspect criminal off the streets.  This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[11]

hh. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged

with perjury for claiming to have caught a burglar "red-handed," when, in fact,

two other officers had made the arrest and handed the arrest off to Mr. Corniel.

The suspect was released.[12]  Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.
>
> That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.
>
> What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false report about what they had seized.
>
> But internal probers are not finding that officers appeared willing to take insidious shortcuts and lie on arrest report when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

---

[11] Mollen Commission Report, pp. 40-41.
[12] Murray Weiss, *NYPD in a Liar Storm*, New York Post, October 26, 2009.

Their reasons could range from trying to cut down on paperwork to being lazy when filing out arrest and incident reports.[13]

ii. In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of criminal charges in connection with those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Officer for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorny Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[14]

jj. In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore our charges against an undercover officer from the Internal Affairs Bureau. As explained in an article in the New York Post:

> The officer were snared in a sting by internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct
>
> Sometime later, they saw a man hanging out on a corner in the neighbor and found that he was carrying packs of knock –off smokes.

---

[13] *Id.*
[14] John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008.

[Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butt to two people, according to sources.

Little did the hapless cops know that the man in their custody was as undercover corruption investigator and that the whole incident was caught on video.

To complete the ruse, the undercover cop was processed at the station house so as to not tip off Stukes and Tirado about the sting…

[P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.

"There's pressure on the cops from the bosses and they're getting pressured form headquarters," a police source told The Post.[15]

The officers were indicted for felony perjury, filing a false report and filling a false instrument.[16]

kk. In early 2010, the City settled a civil rights lawsuit wherein one Officer Sean Spencer[17] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000.  In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant District Attorney that he saw [the plaintiff] beckon the three male passerby and that he was aware the plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."

---

[15] Larry Celona and Tim Perone, *Cops Sting Cops,* N.Y. Post, July 30, 2010.
[16] John Marzulli, *Brooklyn Cops Charged With Barding Into Sting Operation, Arresting A Fellow Officer On Bogus Charges*, N.Y. Daily News, July 30, 2010.
[17] In sum, the CITY has paid out $80,000 to settle four(4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City Shells Out $35G To Grandmother*, Monica Gonzalez, *Busted As Hooker*, New York Daily News, January 7, 2010.

According to the attorney for the Patrolmen's Benevolent Association, disciplinary charges against the officer are pending.[18]

ll. Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports.  District attorneys and their assistants interviewed during a four month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[19]

57. The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct, are further evidence, inter alia, by the following:

mm.      Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that it is followed carefully;

nn. In 1985, former NYPD Commissioner Benjamin Ward, testifying before State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

---

[18] *Id.*
[19] David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, Others Say Department Overlooks Corruption*, New York Newsday, November 18, 1991, at 6.

oo. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of

solidarity with its macho mores and prejudices, its cover-ups and silence, is

reinforced every day in every way."

58. The existence of the above-described unlawful de facto policies and/or well-settled and

widespread customs and practices is known to, encouraged and/or condoned by supervisory and

policy-making officers and officials of the NYPD and the CITY, including, without limitation,

BRATTON.

59. The aforementioned actions of the Defendants resulted from and were taken pursuant to

the above-mentioned de facto policies and/or well-settled and widespread customs and practices

of the CITY, which are implemented by members of the NYPD, of engaging in systematic and

ubiquitous perjury, both oral and written, to cover up federal law violations committed against

civilians by either themselves of their fellow officers, supervisors and/or subordinates.  They do

so with the knowledge and approval of their supervisors, commanders and BRATTON, who all:

(i) tacitly accept and encourage a code of silence wherein police officers refuse to report other

officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony, official

reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public

statements designed to cover for and/or falsely exonerate accused police officers; and (ii)

encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to

discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the

malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by

themselves or fellow officers, supervisors and/or subordinates against those civilians.

60. All of the foregoing acts by Defendants deprived Plaintiff of federally protected rights,

including, but not limited to, the right:

pp. Freedom from unreasonable searches and seizures of his person;

qq. Freedom from arrest without probable cause;

rr. Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which Plaintiff was aware and did not consent;

ss. Freedom from deprivation of liberty without due process of law; and

tt. The enjoyment of equal protection, privilege and immunities under the law.

61. Defendant CITY knew or should have known that the acts alleged herein would deprive plaintiff of his rights, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

62. Defendant CITY is directly liable and responsible for the acts of the individual Defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

63. Despite knowledge of such unlawful de facto policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and City, including BRATTON, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such policies, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of

said policies, practices and/or customs upon the constitutional rights of persons in the CITY of New York.

64. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers encouraging their misconduct are evidenced by the police misconduct detailed herein.  Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the individual Defendants felt empowered to exercise unreasonable and wholly unprovoked force against Plaintiff, arrest Plaintiff without probable cause.  Pursuant to the aforementioned CITY policies, practices and/or customs, the Defendants failed to intervene in or report other Defendants' violations of Plaintiff's rights.

65. Plaintiff's injuries were a direct and proximate result of the Defendant CITY and NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of knowing and repeated failure of the Defendant CITY and the NYPD to properly supervise, train and discipline police officers.

66. The actions of the individual Defendants resulted from and were taken pursuant to the foregoing de facto policies and/or well-settled and widespread customs and practices of the City, which implemented by agents or employees of the NYPD, of employing wholly unprovoked and excessive force.

67. Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the Plaintiff's constitutional rights.

68. As a direct and proximate cause of the acts of all Defendants as set forth above, Plaintiff suffered great shock, pain, suffering, a loss of freedom, emotional distress, mental anguish, shame, humiliation, indignity, damage to reputation in connection with the deprivation of the constitutional

and statutory rights guaranteed by the Fifth and Fourteenth Amendments of the Constitution of the United States and protected by 42 U.S.C. § 1983.

### COUNT IV (42 U.S.C. §§ 1983, 1986 – Failure to Intervene)

69. Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

70. Each of the Defendants had knowledge of the conspiracy to arrest and wrongfully deprive Plaintiff of his constitutional and statutory rights as set forth above.

71. Each of the defendants, through the exercise of reasonable diligence, had the power to prevent or aid in preventing such deprivation.

72. Each of the Defendants neglected or refused to prevent such deprivation.

73. As a direct and proximate cause of the acts of all Defendants as set forth above, Plaintiff suffered great shock, pain, suffering, a loss of freedom, emotional distress, mental anguish, shame, humiliation, indignity, damage to reputation, and deprivation of his constitutional rights in connection with the deprivation of the constitutional and statutory rights guaranteed by the Fifth and Fourteenth Amendments of the Constitution of the United States and protected by 42 U.S.C. § 1983.

### COUNT V (42 U.S.C. §§ 1983, 1985 – Conspiracy to Interfere with Civil Rights)

74. Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

75. Each of the defendants conspired for the purpose of depriving Plaintiff the equal protections of the law.

76. Each of the Defendants took an act in furtherance of the object of said conspiracy.

77. As a direct and proximate cause of the acts of all Defendants as set forth above, Plaintiff suffered great shock, pain, suffering, a loss of freedom, emotional distress, mental anguish, shame, humiliation, indignity, damage to reputation, and deprivation of his constitutional rights in connection with the deprivation of the constitutional and statutory rights guaranteed by the Fifth and Fourteenth Amendments of the Constitution of the United States and protected by 42 U.S.C. § 1983.

## COUNT VI (New York Constitution - Article I)

78. Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

79. By the aforesaid acts, Defendants have violated Plaintiff's right to equal protection laws under Article I, 11 of the New York State Constitution, thereby giving rise to a cause of action pursuant to that article.

80. The conduct and actions of each of the Defendants, acting under color of law, in assaulting, battering, falsely arresting, imprisoning, and using excessive force against Plaintiff, were done intentionally, maliciously and/or with reckless disregard for the natural and probable consequences of their acts, without lawful justification, and were designed to and did cause specific and serious bodily injury, mental and emotional harm, and pain and suffering in violation of the Plaintiff's constitutional rights as guaranteed under the laws and Constitution of the Sate of New York.  As a result of said actions, Plaintiff was deprived of such rights, including, but not limited to, rights under Article I, 8-9 of the New York State Constitution guaranteeing freedom of expression and association, Article I, 12, guaranteeing protection against unlawful seizure of his person, Article I, 11, guaranteeing due process and equal

protection under the law, and Article I, 15 guaranteeing protection from cruel and unusual punishment.

81. As a result of the foregoing, Plaintiff was deprived of his liberty, suffered great shock, pain, suffering, a loss of freedom, emotional distress, mental anguish, shame, humiliation, indignity, damage to reputation, and deprivation of his constitutional rights.

## COUNT VIII (Assault and Battery)

82. Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

83. By the actions described above, the individual Defendants did inflict assault and battery upon Plaintiff.  The acts and conduct of these Defendants were the direct and proximate cause of injury and damage to Plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

84. As a result of the forgoing, Plaintiff was deprived of his liberty, suffered great shock, pain, suffering, a loss of freedom, emotional distress, mental anguish, shame, humiliation, indignity, damage to reputation, and deprivation of his constitutional rights.

85. For all claims under New York State Law, Defendants are jointly and severally liable to Plaintiff inasmuch as this action arises out of the exceptions set forth in 1602 subdivision 5, 7 and 11 of the Civil Practice Law and Rules.

## COUNT VIII (False Arrest and Imprisonment)

86. Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

87. By the actions described above, each of the Defendants caused to be falsely arrested or falsely arrested Plaintiff, without reasonable or probable cause, illegally and without a warrant,

and without any right or authority to do so. The acts and conduct of the Defendants were the direct and proximate cause of injury and damage to Plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

88. The false arrest and confinement of the Plaintiff occurred after he was arrested and sustained great shock, pain, suffering, a loss of freedom, emotional distress, mental anguish, shame, humiliation, indignity, damage to reputation, and deprivation of his constitutional rights.

89. As a result of the forgoing, Plaintiff was deprived of his liberty, suffered great shock, pain, suffering, a loss of freedom, emotional distress, mental anguish, shame, humiliation, indignity, damage to reputation, and deprivation of his constitutional rights.

## COUNT IX (Negligence)

90. Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

91. Each of the Defendants, jointly and severally, negligently caused injuries, emotional distress and damage to the Plaintiff. The acts and conduct of the Defendants were the direct and proximate cause of the injury and damage to the Plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

92. As a result of the forgoing, Plaintiff was deprived of his liberty, suffered great shock, pain, suffering, a loss of freedom, emotional distress, mental anguish, shame, humiliation, indignity, damage to reputation, and deprivation of his constitutional rights.

## COUNT X (Negligent Hiring and Retention)

93. Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

94. The Defendants CITY and NYPD did not exercise reasonable care and diligence in the selection, engagement, employment and training of its agents, servants, and employees and were negligent in hiring, training and retention of the individual Defendants, so as to cause serious physical injury to plaintiff.

95. Such negligence consisted of negligence in training, hiring, supervision and retention of the individual Defendants involved in this incident; in failing to observe the existing police department protocols for police officers/detectives causing the serious injuries, deprived Plaintiff's civil rights, privileges ad immunities secured under the Constitutions of the United States of America and the State of New York; in failing to use care in the performance of police duties as reasonably prudent and careful police officers would have used in similar circumstances; in hiring and retaining persons who were unfit to serve as police officers/detectives; failing to properly investigate their background; failing to properly train and instruct police officers/detectives, especially regarding the abuse of power while in the field; failing to give police officers/detectives proper instructions; failing to give police officers/detectives training, including the police officers/detectives as well as in the staffing, administration and processing of persons suspected of violation of the criminal laws of the State of New York which allowed the false arrest of the Plaintiff, which resulted in the serious and permanent physical injuries Plaintiff sustained.

96. The Defendants CITY and NYPD, through their agents, servants, employees, including but not limited to the individual Defendants were negligent, reckless and careless in arresting the Plaintiff.

97. The Defendants CITY and NYPD had prior knowledge of the inappropriate, unlawful, and improper conduct of the individual Defendants, and continued to employ them and allowed them to be in contact with the public at large.

## COUNT XI (Punitive Damages)

98. Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

99. The actions of all the Defendants herein above alleged were malicious, willful and grossly negligent.

100.      The Defendants CITY and NYPD authorized, permitted and ratified the unlawful and negligent acts of the individual Defendants.

101.      By reason of the foregoing, Plaintiff demands judgment for punitive damages against the Defendants CITY and NYPD, including, but not limited to the individual Defendants, in a sum exceeding the jurisdictional limits of all the lower courts.

102.      As a result of the forgoing, Plaintiff was deprived of his liberty, suffered great shock, pain, suffering, a loss of freedom, emotional distress, mental anguish, shame, humiliation, indignity, damage to reputation, and deprivation of his constitutional rights.

## COUNT XII (Intentional Infliction of Emotional Distress)

103.      Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

104.      As a result of the foregoing, the plaintiff was deprived of his liberty, suffered great shock, pain, suffering, a loss of freedom, emotional distress, mental anguish, shame, humiliation, indignity, damage to reputation, and deprivation of his constitutional rights.

## COUNT XIII (Prima Facie Tort)

105.     Plaintiff repeats and realleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

106.     Defendants failed to adhere to proper police protocols.

107.     As a result of the foregoing, the plaintiff was deprived of his liberty, suffered great shock, pain, suffering, a loss of freedom, emotional distress, mental anguish, shame, humiliation, indignity, damage to reputation, and deprivation of his constitutional rights.

**WHEREFORE**, Plaintiff MD MOZUMDER respectfully requests judgment upon all causes of action against Defendants as follows:

1.     With respect to Defendant CITY and Defendant NYPD:

   a.   Declaratory judgment declaring that Defendant CITY and Defendant NYPD has violated the aforesaid statutes and constitutions;

   b.   Restitution to Plaintiff of his rights, privileges, benefits and income which would have been received by him but for Defendants unlawful, wrongful, tortuous, and unconstitutional conduct;

   c.   Compensatory damages in an amount to be determined by the court and jury;

   d.   Punitive damages in an amount to be determined by the court and jury;

   e.   Reasonable attorney's fees, disbursements and costs of this action, pursuant to 42 U.S.C. § 1988;

   f.   All legal and statutory interest on sums awarded; and

   g.   Such other and further relief as this Honorable Court may deem just, proper and equitable.

2.   With respect to each of the individual Defendants:

a. Declaratory judgment declaring that the Defendants have violated the aforesaid statutes and constitutions;

b. Restitution to Plaintiff of his rights, privileges, benefits and income which would have been received by him but for each Defendants' unlawful, wrongful, tortuous, and unconstitutional conduct;

c. Compensatory damages in an amount to be determined by the court and jury;

d. Punitive damages in an amount to be determined by the court and jury;

e. Reasonable attorney's fees, disbursements and costs of this action, pursuant to 42 U.S.C. § 1988;

f. All legal and statutory interest on sums awarded; and

g. Such other and further relief as this Honorable Court may deem just, proper and equitable.

Dated:   Brooklyn, New York
         May 15, 2017

BARON ASSOCIATES P.C.
Attorneys for the Plaintiff
2509 Avenue U
Brooklyn, New York 11229
Tel: 718-934-6501
Fax: 718-648-7781

By:   Michael Ma, Esquire (MM1689)